**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CORNING INCORPORATED, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| DONGGUAN JINGBO | ) |
| OPTOELECTRONICS CO., LTD., | ) |
| | ) |
| Defendant | ) |

CIVIL ACTION NO.:  6:18-cv-06866

███████████████████████

**DEFENDANT DONGGUAN JINGBO OPTOELECTRONICS CO., LTD'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(5) AND 12(b)(6)**

William G. Bauer
Erin E. Elmouji
WOODS OVIATT GILMAN LLP
1900 Bausch & Lomb Place
Rochester, New York 14604
(585) 987-2800
wbauer@woodsoviatt.com
eelmouji@woodsoviatt.com

OF COUNSEL:
Mark J. Abate
Calvin E. Wingfield Jr.
Keith A. Zullow
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
mabate@goodwinlaw.com
cwingfield@goodwinlaw.com
kzullow@goodwinlaw.com

*Attorneys for Defendant Dongguan Jingbo
Optoelectronics Co., Ltd.*

Dated:  March 16, 2020

**Table Of Contents**

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS ................................................................... 3

     A.    The Agreement Defines "Corning Technology" to Refer To Know-How, Processes and Formulae, Not Products .................................. 3

     B.    The Agreement Allows Corning to Ensure That Jingbo Exercises "Reasonably Prudent and Diligent Efforts to Protect Corning Technology from Further Disclosure and/or Misuse" ............... 6

     C.    Corning's Breach of Contract Allegations ........................................ 6

     D.    Service of Corning's Complaint ...................................................... 8

III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ................... 8

     A.    Legal Standards ............................................................................ 8

     B.    Argument ................................................................................... 10

          1.    The Court Should Dismiss Corning's Complaint Because it Fails to Make Any Factual Allegations That Jingbo Necessarily Used "Corning Technology" to Finish Non-Corning Glass ............................. 10

               a.    The Term "Corning Technology" Refers to Methods for Making a Glass Article with Improved Properties, Not the Glass Article Itself ....................................................... 10

               b.    Corning's Allegations About Its Patents Fail to Support Its Breach of Contract Claim .......................................... 12

               c.    Corning Failed to Allege Any Facts Showing That Jingbo *Necessarily* Used "Corning Technology" to Finish Non-Corning Glass .......................................................... 14

          2.    Count II of Corning's Complaint Should Be Dismissed Because Corning's Inspection Request Exceeds What the Agreement Permits .................................................... 16

IV.   CORNING'S E-MAIL SERVICE OF THE COMPLAINT WAS IMPROPER ............. 18

V.    CONCLUSION ................................................................................. 20

## Table Of Authorities

**Cases**                                                                                                            **Page(s)**

*AEI Life LLC v. Lincoln Benefit Life Co.*,
   892 F.3d 126 (2d Cir. 2018).................................................................................................11

*Anova Applied Elecs., Inc. v. Hong King Grp., Ltd.*,
   No. 17-12291 (FDS), 2020 WL 419518 (D. Mass. Jan. 24, 2020)...................................18, 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................2, 8, 9, 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).....................................................................................................2

*First Serv. Fin. Inc. v. City Lights at Queens Landing, Inc.*,
   2009 WL 750190 (S.D.N.Y. Mar. 20, 2009) ..................................................................9

*Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified on Schedule
   "A"*,
   391 F. Supp. 3d 816 (N.D. Ill. 2019) ..........................................................................18

*Panduit Corp. v. Corning Inc.*,
   2019 WL 189817 (E.D.N.C. Jan. 14, 2019) ..............................................................9, 16

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
   137 S. Ct. 1504, 1507 (2017)........................................................................................9

*Water Splash Inc. v. Menon*,
   647 F. Supp. 2d 323 (D. Del. 2009)........................................................................17, 18

**Other Authorities**

Fed. R. Civ. P. 4(f)(1) ....................................................................................................17

Fed. R. Civ. P. 4(f)(3) ................................................................................................17, 19

Fed. R. Civ. P. 8(a) .........................................................................................................2

Fed. R. Civ. P. 12(b)(5) .................................................................................................3, 20

Fed. R. Civ. P. 12(b)(6)................................................................................................2, 8

## I.    INTRODUCTION

Dismissal of Plaintiff Corning Incorporated's ("Corning's") Complaint against Defendant Dongguan Jingbo Optoelectronics Co., Ltd. ("Jingbo") is warranted for the following two reasons:  (1) Corning failed to state a claim upon which relief may be granted; and (2) Corning did not properly serve Jingbo with the Complaint.

First, Corning alleges that Jingbo breached the parties' June 3, 2017 General Commercial Framework Agreement ("Agreement")[1] by purportedly:  (1) misusing "Corning Technology," as defined in the Agreement, to finish non-Corning glass; and (2) failing to allow Corning to review and inspect Jingbo's facilities.  But those claims are based on threadbare allegations, faulty logic, and misinterpretations of the Agreement.

Corning's allegations that Jingbo misused Corning's technology are threadbare and insufficient.  Corning pled no factual allegations regarding Jingbo's actual process for finishing non-Corning glass.  Corning alleges that it tested glass that Jingbo finished for a third party (Vivo) that purportedly shows that the glass is a "glass-based article" with certain properties recited in a Corning patent claim.  D.I. 1 at ¶ 10.  But Corning's logic is flawed.  The Agreement defines "Corning Technology" in terms of trade secrets, know-how, processes, formulae, and other teachings used to **manufacture** glass with certain properties.  Ex. A[2] at §§ 1(c)–(h) (emphasis added).  Nowhere is "Corning Technology" defined in terms of a glass-based article having certain properties.  Moreover, Corning failed to plead any facts suggesting that any property recited in the patent claim is unique to glass made using or can only be obtained by using "Corning Technology."  Indeed, Corning did not even plead facts from which that

---

[1] An unredacted copy of the Agreement is attached as Exhibit A to the Declaration of Keith A. Zullow filed in support of this motion (the "Zullow Declaration").
[2] "Ex. __" cites are exhibits attached to the Zullow Declaration.

conclusion could be reasonably inferred, and therefore failed to state a claim for breach of contract.

Corning also did not allege facts sufficient to support its breach of contract claim based on the Agreement's inspection provision.  Indeed, Corning's allegations that Jingbo refused to allow an inspection are unsupported.  Moreover, Corning's allegations imply that the Agreement grants Corning free rein to inspect Jingbo facilities, including inspection of Jingbo's work for third parties, for misuse or unauthorized disclosure of Corning Technology.  It does not.  The Agreement allows Corning to "review and inspect" whether Jingbo satisfactorily adopted and implemented steps to prevent "misuse" and/or unauthorized "disclosure" of "Corning Technology":  "Corning and its representatives shall have the right to review and inspect [Jingbo's] operations and security procedures to ensure that Finisher [(i.e., Jingbo)] is using reasonably prudent and diligent efforts to protect Corning Technology from further disclosure and/or misuse."  Ex. A at § 3(b)(v).  Because Corning sought a much broader inspection than permitted by the Agreement, Corning has failed to sufficiently allege breach of contract based on the inspection provision.

For these reasons and those explained below, the Complaint fails to meet the notice pleading requirements of Federal Rule of Civil Procedure 8(a) and applicable Supreme Court precedent in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

Second, Corning's service of the Complaint by e-mail was deficient.  Rule 4(f)(3) allows service "by other means not prohibited by international agreement, as the court orders."

███████████████████

However, e-mail service is inconsistent with the methods enumerated in the Hague Convention,[3] to which the United States and China are parties.  Therefore, Corning's service of the Complaint violates Federal Rule of Civil Procedure 4(f)(3) and the Complaint should be dismissed under Rule 12(b)(5) for insufficient service of process.

## II.    STATEMENT OF FACTS

### A.    The Agreement Defines "Corning Technology" to Refer To Know-How, Processes and Formulae, Not Products

On June 3, 2017, Corning and Jingbo entered into the General Commercial Framework Agreement.  Ex. A at 1.  Under the Agreement, Jingbo agreed to perform finishing services using Corning Technology to strengthen glass sold by Corning, known as Gorilla Glass.  *Id.*  Jingbo also agreed that Corning Technology would "only be practiced on Gorilla Glass purchased by [Jingbo] from Corning."  *Id.* at § 3(b)(ii).

The Agreement defines the term "Corning Technology" as follows:  "Corning Technology means Corning Know-How, Corning's Improved Impact Resistance Technology, Corning's Improved Component Level Impact Resistance/Drop Performance Technology, ███, ███████████████████████████████, as defined above."  *Id.* at § 1(h).  The definition of each term embedded in the definition of "Corning Technology" uses the common refrain of "know-how, processes, formulae, and other teachings" related to processing/finishing glass:

> "Corning Know-How" means **know-how, processes, formulae, and other teachings** owned, developed or licensed by Corning that may be used to perform certain services required to provide a finished glass product."  *Id.* at § 1(c) (emphasis added).

---

[3] "Hague Convention" refers to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638.

> **"Improved Impact Resistance Technology"** shall mean
> Corning's proprietary technology, **including trade secrets, know-
> how, processes, formulae, and other teachings**, to improve
> component level impact resistance. *Id.* at § 1(d) (emphasis added).



The Agreement also defines "Corning's Improved Component Level Impact Resistance/Drop Performance Technology" using the same common refrain about Corning's know-how, processes, formulae, and other teachings: "Corning's Improved Component Level Impact Resistance/Drop Performance Technology shall mean Corning's proprietary technology, including **trade secrets, know-how, processes, formulae, and other teachings**, related [sic; to] glass articles which exhibit improved component level impact resistance/drop performance." *Id.* at § 1(e) (emphasis added). Corning acknowledges that the definition contained a typo and encompasses only Corning's know-how, processes, formulae and other teachings **related to** glass articles, and not the glass articles themselves, quoting the definition as follows: "Corning's proprietary technology, including trade secrets, know-how, processes, formulae, and other teachings, **related [to]** glass articles which exhibit improved component level impact resistance/drop performance." D.I. 1 at ¶ 59 (quoting Ex. A at § 1(e) (emphasis added)).

When the Agreement was entered, Corning had a number of patents and applications claiming strengthened glass. The Agreement, however, never defines "Corning Technology" in

terms of a glass-based article that practices or embodies any subject matter claimed in those

patents or applications.  Instead, the Agreement includes within the definition of "Corning

Technology" only "the technology and information which is disclosed in" identified patents and

patent applications.  Ex. A at §§ 1(d)–(f).  This refers to process technology and information

related to finishing glass described within a patent specification, and not the claimed glass article

resulting from such a process.  For example, the Agreement references U.S. Patent Application

No. 62/266,411 ("US-411").  US-411 discloses, *inter alia*, the following technology and

information related to finishing glass:

- Ion-exchange processes and materials and conditions used in those processes.  D.I. 1, Ex. 2 at [0071]–[0073].

- Processes for forming fracture-resistant glass-based articles, again including materials and conditions.  *Id.* at [00169]–[00172].

- Process parameters for ion-exchange and chemical treatment for producing glass-based articles with certain properties.  *Id.* at [00174]–[00198].

Thus, "Corning Technology" as defined in the Agreement does not include glass-based articles

that embody or practice the claims of any Corning patents.

The Complaint itself further acknowledges that the Agreement defines "Corning

Technology" in terms of know-how, processes, formulae, and other teachings—and not glass-

based articles.  For example, the Complaint states the following:

- "Corning agreed to teach Jingbo its proprietary technologies—which are defined in the agreement as 'Corning Technology'—so that Jingbo **could use those technologies to finish** Corning Gorilla Glass."  D.I. 1 at ¶ 34 (emphasis added).

- "Corning transferred its 'GG5 ion exchange and metrology **processes**' to Jingbo."  *Id.* at ¶ 45 (emphasis added).

- "The trade secrets and technology that Corning disclosed to Jingbo **for use in finishing** Gorilla Glass 5 are covered under the definition of 'Corning Technology' in the Agreement."  *Id.* at ¶ 50 (emphasis added).

These examples describe processes or technology used to finish glass.  Glass articles themselves cannot be used to finish glass.  This evidences the parties' understanding that "Corning Technology" is limited to processes **used to manufacture or finish** glass, and does not extend to the glass-based articles themselves.

**B.   The Agreement Allows Corning to Ensure That Jingbo Exercises "Reasonably Prudent and Diligent Efforts to Protect Corning Technology from Further Disclosure and/or Misuse"**

The Agreement requires Jingbo to maintain the proprietary and confidential nature of the "Corning Technology."  Jingbo agreed to protect the "Corning Technology . . . from further disclosure or misuse . . . in the same manner as it protects its own trade secrets, but in any event . . . [to exercise] reasonable care . . . to protect such technology from further disclosure or misuse."  Ex. A at § 3(b)(iv).  And Jingbo agreed that "Corning and its representatives shall have the right to review and inspect [Jingbo]'s operations and security procedures to ensure [it] is using **reasonably prudent and diligent efforts** to protect Corning Technology from further disclosure and/or misuse."  *Id.* at § 3(b)(v) (emphasis added).  The Agreement does not grant Corning free rein to inspect Jingbo's facility.

**C.   Corning's Breach of Contract Allegations**

Corning's Complaint alleges that Jingbo breached the Agreement by:  (1) misusing Corning Technology to finish non-Corning cover glass (D.I. 1 at ¶ 70); and (2) refusing Corning's request to review and inspect Jingbo's operations and security procedures for further misuse and/or unauthorized disclosure of Corning Technology (*id.* at ¶ 75).

Corning's first breach of contract theory relies on testing of non-Corning glass used in Vivo Smartphones that purportedly "indicate[s] that Jingbo has furnished non-Corning cover glass using Corning Technology in at least two respects."  *Id.* at ¶ 55.  Corning alleges that the non-Corning glass uses "Corning Technology" described in "multiple Corning patents"—U.S.

██████████████████████

Patent No. 9,908,811 B2 ("US '811 patent") and China Utility Model Patent No. CN206986034

("CN '034 patent")—"whose disclosures are included within the definition of Corning

Technology under the Agreement."  *See id.* at ¶¶ 55–58.  Corning also alleges that the glass

tested "has stress profile and performance characteristics that match those obtained from

finishing cover glass with Corning Technology."  *Id.* at ¶ 59.  And Corning alleges that "Jingbo

is using Corning Technology to increase its efficiency and yield in finishing non-Corning cover

glass."  *Id.*

Corning's *factual* allegations, however, do not support those conclusions.  For example,

Corning alleges its testing of cover glass for Vivo smartphones supports its conclusions.  *Id.* at

¶¶ 10, 55.  But Corning failed to plead:  (a) facts identifying the testing it conducted or the actual

test results; (b) facts about the processes or methods Jingbo allegedly employed to prepare the

Vivo cover glass; (c) that using "Corning Technology" is the **only way** to make glass having the

stress profile and performance characteristics recited in its patent claims; or (d) that any property

recited in its patent claims is a unique marker or identifier of "Corning Technology."  Thus,

Corning's conclusory allegations are insufficient to support its claim that Jingbo has misused the

"Corning Technology."

Corning also alleges that Jingbo breached the Agreement's inspection provision by

refusing to allow Corning "to review and inspect Jingbo's operations and security procedures for

further misuse and/or unauthorized disclosure of Corning Technology."  *Id.* at ¶ 75.  But

Corning's allegation of "refusal" is unsupported.  Moreover, the Agreement, which permits

inspection "**to ensure [Jingbo] is using reasonably prudent** and **diligent efforts** to protect

Corning Technology from further disclosure and/or misuse" (Ex. A at § 3(b)(v) (emphasis

added)), does not grant Corning free rein to conduct the ████████████ requested in its

████████████████████

Notice Letter to Jingbo.  Because Corning's allegation of "refusal" is unsupported, and because Jingbo had no obligation to allow Corning's ████████████ of its facilities, Jingbo has not breached the Agreement's "review and inspection" provision and the Court should dismiss Count II of the Complaint.

### D. Service of Corning's Complaint

Corning filed its Complaint against Jingbo on December 3, 2018.  D.I. 1.  On February 22, 2019, Corning initiated a formal request with the Chinese Ministry of Justice to serve the Complaint on Jingbo pursuant to the Hague Convention.  D.I. 7 at 1, Ex. 2.  On December 16, 2019, Corning moved the Court to permit service of the Complaint by e-mail to Jingbo's General Manager and Purchasing Manager.  D.I. 7.  The Court granted Corning's motion on January 15, 2020, and ordered that Corning's December 10, 2018 e-mails to Jingbo attaching the Summons and Complaint constituted service.  D.I. 9.  However, as explained below, Corning's e-mail service was invalid because it was inconsistent with the methods for service enumerated in the Hague Convention.

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

### A. Legal Standards

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Although a court must accept as true all factual allegations contained in a complaint, that requirement does not apply to legal conclusions.  *Id.* at 678–79.  The pleadings must include non-conclusory factual allegations to support the legal claims asserted.  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

8

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted). Determining whether a complaint contains a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"Where there is no ambiguity to a contract and 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may be resolved on a motion to dismiss." *First Serv. Fin. Inc. v. City Lights at Queens Landing, Inc.*, No. 8-3312, 2009 WL 750190, at *2 (S.D.N.Y. Mar. 20, 2009) (internal citation omitted). "Ambiguity exists when a material contract term or clause is susceptible of 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id*. (internal citation omitted).

An accusation that test results are consistent with the use of a particular method, without *factual* allegations that the particular "method is the only way in which to produce [a result]," is insufficient to overcome a motion to dismiss. *Panduit Corp. v. Corning Inc.*, No. 18-229 (FL), 2019 WL 189817, at *4 (E.D.N.C. Jan. 14, 2019). While circumstantial evidence may be used to demonstrate patent infringement, the evidence must still indicate that infringement actually occurred. That is, a patentee must "either point to specific instances of direct infringement or show that the accused device **necessarily** infringes the patent in suit." *SRI Int'l Inc. v. Internet*

███████████████████████

*Sec. Sys., Inc.*, 647 F. Supp. 2d 323, 336 (D. Del. 2009) (quoting *ACCO Brands v. ABA Locks Manuf. Co.,* 501 F.3d 1307, 1313 (Fed. Cir. 2007) (emphasis added).

    **B.**    **Argument**

        **1.**    **The Court Should Dismiss Corning's Complaint Because it Fails to Make Any Factual Allegations That Jingbo Necessarily Used "Corning Technology" to Finish Non-Corning Glass**

The Agreement limits "Corning Technology" to Corning's proprietary technology, including trade secrets, know-how, processes, formulae, and other teachings used to make glass with improved properties. Corning Technology does not extend to glass articles themselves, regardless of how they are made, and regardless of their properties. Corning did not plead *factual* allegations that permit a reasonable inference that glass-based articles exhibiting the properties recited in Corning's patent claims **necessarily** were made using "Corning Technology." Thus, Corning has failed to allege *facts* sufficient to support its claim that Jingbo has misused "Corning Technology." The Court therefore should dismiss Count I of the Complaint.

        a.    <u>The Term "Corning Technology" Refers to Methods for Making a Glass Article with Improved Properties, Not the Glass Article Itself</u>

The Agreement defines "Corning Technology" through other defined terms: "Corning Know-How, Corning's Improved Impact Resistance Technology, Corning's Improved Component Level Impact Resistance/Drop Performance Technology, ████████████████ ███████████████████████, as defined above." Ex. A at § 1(h). The Agreement in turn defines each of those terms using the common refrain "know-how, processes, formulae, and other teachings" to strengthen glass. *Id.* at §§ 1(c)–(h). In addition to the definitions, when discussing the parties' respective obligations, the Agreement uses the term "Corning Technology" to refer to know-how, processes, formulae, and other teachings—not to glass-based articles. The Agreement states, for example, that:

■■■■■■■■■■■■■■

(a) Jingbo "has the capability to edge, cut and generally **perform** finishing services." *Id.* at 1 (emphasis added).

(b) Corning will transfer "Corning Technology to enable [Jingbo] **to perform** the services requested." *Id.* at § 3(a).

The Agreement unambiguously indicates the parties' understanding that "Corning Technology" refers to methods or processes, not the resulting glass-based articles. The Court should interpret the term "Corning Technology" consistent with that understanding. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) ("Under New York law . . . 'contracts should be interpreted so as to effectuate the parties' intent.'") (internal citations omitted).

Further, the Complaint consistently refers to Corning Technology as **processes** or **actions** Jingbo would **perform to make and finish** Corning's glass:

- "Corning agreed to teach Jingbo its proprietary technologies—which are defined in the agreement as 'Corning Technology'—so that Jingbo **could use those technologies to finish** Corning Gorilla Glass." D.I. 1 at ¶ 34 (emphasis added).

- "Corning transferred its 'GG5 ion exchange and metrology **processes**' to Jingbo." *Id.* at ¶ 45 (emphasis added).

- "The trade secrets and technology that Corning disclosed to Jingbo **for use in finishing** Gorilla Glass 5 are covered under the definition of 'Corning Technology' in the Agreement." *Id.* at ¶ 50 (emphasis added).

Furthermore, Corning's pre-suit correspondence ■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■





Thus, the Agreement, Corning's allegations, and Corning's pre-suit correspondence reflect the parties' understanding that "Corning Technology" refers to methods or processes for finishing glass—not glass-based articles themselves.

      b.    <u>Corning's Allegations About Its Patents Fail to Support Its Breach of Contract Claim</u>

Corning's allegations about its patents are not relevant and do not support its breach of contract claim. Corning alleges that "patented Corning Technology that Corning shared with Jingbo is covered under the definition of 'Corning Technology' in the Agreement." D.I. 1 at ¶ 51 (citing Ex. A at § 1(h), 3). But that allegation misrepresents the unambiguous scope of the Agreement. Section 1(e) of the parties' Agreement, on which Corning relies, defines the term "Corning's Improved Component Level Impact Resistance/Drop Performance Technology" as "Corning's proprietary technology, including trade secrets, know-how, processes, formulae, and

other teachings, related [to][4] glass articles which exhibit improved component level impact resistance/drop performance." Ex. A at § 1(e). Thus, the "Corning Technology" relates to how to make glass articles; it does not relate to the glass articles themselves. Pursuant to Section 1(e), the definition "includes, but is not limited to the **technology and information which is disclosed**" in certain Corning patents and patent applications. *Id.* (emphasis added). Again, this references technology and information relating to how to make glass articles; it does not relate to the glass articles themselves. Section 1(e) in no way expands the definition of "Corning Technology" to include glass-based articles that have properties recited in Corning patent claims.

Section 3(b)(iii) of the Agreement affirms that the definition in Section 1(e) does not include glass-based articles with properties recited in Corning patent claims. It states that Jingbo "**may use** Corning's Improved Component Level Impact Resistance/Drop Performance Technology **only on** Corning glass." *Id.* at § 3(b)(iii) (emphasis added). The referenced technology cannot include glass based articles because Jingbo could not **use** a glass-based article **on** glass supplied by Corning.

Corning also alleges that, based on testing it conducted, Vivo cover glass "meets each of the requirements of" claims from Corning patents. D.I. 1 at ¶¶ 57–58. But whether that is true is not pertinent to Corning's breach of contract claim because the Agreement is directed to technology used to make glass-based articles, not the articles themselves. As explained below, Corning failed to allege any facts showing that Jingbo necessarily used "Corning Technology" to finish non-Corning glass. Moreover, breach of contract and patent infringement are separate causes of action; and Corning did not plead patent infringement.

---

[4] As explained above, Corning recognizes that this is the correct reading of Section 1(e) of the Agreement. *Supra* II.A.

c.    Corning Failed to Allege Any Facts Showing That Jingbo *Necessarily* Used "Corning Technology" to Finish Non-Corning Glass

Corning did not allege any facts that would permit a reasonable inference that Jingbo necessarily used "Corning Technology" to finish non-Corning glass.  Corning conclusorily alleges that testing of Vivo smartphone glass "indicates that it was finished using such Corning Technology" because it allegedly has the improved properties of the glass claimed in Corning's patents (*id.* at ¶¶ 56–58) and a stress profile and performance characteristics that match those obtained from finishing cover glass with Corning Technology (*id.* at ¶ 59).  But "Corning Technology" refers only to methods and processes to make strengthened or impact-resistant glass, not the glass-based articles themselves.  *Supra* II.A.  Moreover, Corning's test results do not evidence that Jingbo used "Corning Technology" to finish non-Corning glass because Corning has not alleged that the use of "Corning Technology" is the only way to achieve the properties of the Vivo glass that Corning tested.

Corning offers no factual allegations as to why glass that "has stress profile and performance characteristics that match those obtained from finishing cover glass with Corning Technology" **necessarily** means that the glass was finished with Corning Technology.  D.I. 1 at ¶ 59.  Corning attempts to rely on an inference of patent infringement based on conclusory allegations that its undisclosed testing indicates that Vivo glass meets the requirements of Corning patent claims.  *Supra* III.B.1.b.  Corning's allegations are insufficient because Corning did not allege (a) that any method or process disclosed in its patents or that Corning provided to Jingbo is the only way to make the glass-based articles recited in its patent claims, or (b) that the properties recited in its patent claims are unique identifiers or markers for "Corning Technology."

14

███████████████████████████

The Complaint twice refers to allegedly "unique" stress profiles.  D.I. 1 at ¶¶ 28, 30.

First, in a description of "Gorilla Glass innovations," Corning states that "Corning's patented and

proprietary finishing technologies impart these unique stress profiles to Gorilla Glass products to

help make them exceptionally durable and damage resistant."  *Id*. at ¶ 28.  Second, in the

discussion of U.S. Patent No. 9,908,811 B2, Corning cites portions of the patent that refer to the

allegedly unique stress profiles.  *Id*. at ¶ 30.  Regardless of whether the stress profile for

Corning's Gorilla Glass is "unique" or different from stress profiles for other glass, there often

are many ways to achieve the same result—even a purportedly unique result.  Notably, Corning

never alleges, or establishes, as it must, that using "Corning Technology" is the only way to

achieve the purportedly unique stress profiles.  In addition, Corning does not allege that the Vivo

glass it tested has the allegedly "unique stress profiles" found in Corning's Gorilla Glass.  Rather

Corning only alleges that:  (1) the tests show that the glass meets certain patent claims; (2) the

tests "indicate[]" that the Vivo glass was finished with "Corning Technology"; and (3) the glass

has a "stress profile and performance characteristics that match those obtained from finishing

cover glass with Corning Technology."  *Id*. at ¶¶ 56–60.  Further, Corning has not alleged that

the "unique" properties imparted by its "patented and proprietary finishing techniques" are the

same properties recited in the Corning patent claims referenced in the Complaint.

The Complaint also lacks factual allegations sufficient to support Corning's conclusory

statements.  Corning's only factual support is purported testing of Vivo phone glass.  Corning,

however, failed to plead factual allegations about the processes Jingbo allegedly employed to

finish the Vivo glass or showing that Jingbo used "Corning Technology" to finish the Vivo glass.

Moreover, ████████████████████████████████████████████



Nevertheless, Corning left those necessary but unsupportable

allegations out of the Complaint, and thereby failed to state a claim for breach of contract.

Finally, Corning's conclusory allegations are also insufficient to overcome a motion to

dismiss a claim for patent infringement.[5] *Panduit Corp.*, 2019 WL 189817, at *4.

For all of these reasons, this Court should dismiss Corning's threadbare claim that Jingbo

has misused Corning Technology.

> **2.**     **Count II of Corning's Complaint Should Be Dismissed Because Corning's Inspection Request Exceeds What the Agreement Permits**

Corning also failed to adequately plead breach of contract based on the Agreement's

inspection provision.  Corning's allegation that Jingbo "refused Corning's requests" for an

inspection is unsupported. *See* D.I. 1 at ¶ 62.  Indeed, Jingbo never expressly refused Corning's

requests.

Moreover, even had Jingbo expressly refused Corning's request for an inspection (which

it did not), Corning's ▮▮▮▮▮▮▮▮ request far exceeded the scope of inspection

---

[5] Courts analyze patent-infringement allegations using the same *Twombly/Iqbal* standard as breach of contract allegations. *See Panduit Corp.*, 2019 WL 189817, at *3 ("To meet this standard, a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" (quoting *Iqbal*, 556 U.S. at 663 (citation and quotation marks omitted))).

███████████████████████████

permitted by the Agreement.  The Agreement states that Jingbo "shall protect[] [Corning Technology] from further disclosure or misuse . . . in the same manner as it protects its own trade secrets, but in any event reasonable care must be taken to protect such technology from further disclosure or misuse."  Ex. A at § 3(b)(iv).  The inspection provision states, "Corning and its representatives shall have the right to review and inspect [Jingbo]'s operations and security procedures to ensure that Finisher is using **reasonably prudent and diligent efforts** to protect Corning Technology from further disclosure and/or misuse."  *Id.* at § 3(b)(v) (emphasis added). The inspection provision does not grant Corning free rein to inspect Jingbo's facilities, as Corning's allegations imply.  *Id.*  Rather, it limits Corning's rights to inspecting Jingbo's "operations and security procedures" to ensure that Jingbo is using "reasonably prudent and diligent efforts" to protect "Corning Technology."  *Id.*  That includes ensuring that Jingbo has implemented proper protocols to protect "Corning Technology," such as video surveillance, restricted access for authorized personnel only to areas where Jingbo uses or stores "Corning Technology," and password protection for access to electronic files about "Corning Technology." ███████████████████████████

███████████████████████████████████

███████████████████████████████████

█ Jingbo has never refused to allow Corning to review and inspect Jingbo's efforts (operations and security procedures) to protect "Corning Technology," and therefore has not breached the Agreement.

For these reasons, the Court should dismiss Count II of Corning's Complaint for failure to state a claim for breach of contract.

17

## IV.    CORNING'S E-MAIL SERVICE OF THE COMPLAINT WAS IMPROPER

Federal Rule of Civil Procedure 4(f) allows a Plaintiff to serve an individual in a foreign

country by "internationally agreed means of service," such as the Hague Convention (Fed. R.

Civ. P. 4(f)(1)), or "by other means **not prohibited by international agreement**, as the court

orders" (Fed. R. Civ. P. 4(f)(3)) (emphasis added).  Corning's e-mail service of the Complaint

fails to comply with Rule 4(f)(3) because it is prohibited by the relevant international agreement,

the Hague Convention.

"The Hague Service Convention specifies certain approved methods of service and 'pre-

empts inconsistent methods of service' wherever it applies."  *Water Splash Inc. v. Menon*, 137

S. Ct. 1504, 1507 (2017) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694,

699 (1988).  The Hague Convention permits service only by the following means:  via a central

authority (Articles 2-7); diplomatic and consular agents (Article 8); mail or through a judicial

official of the State of destination, if the destination State does not object (Article 10).  *See Water

Splash Inc.*, 137 S. Ct. at 1508 (reviewing permitted service methods).  In addition, "Article 11

provides that any two states can agree to methods of service not otherwise specified in the

Convention" and "Article 19 clarifies that the Convention does not preempt any internal laws of

its signatories that permit service from abroad via methods not otherwise allowed by the

Convention."  *Id.*

The Hague Convention is silent regarding service by e-mail.  However, e-mail service is

inconsistent with the Convention's enumerated methods, and therefore prohibited.  *Anova*

*Applied Elecs., Inc. v. Hong King Grp., Ltd.*, No. 17-12291 (FDS), 2020 WL 419518, at *6 (D.

Mass. Jan. 24, 2020); *Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified on

Schedule "A"*, 391 F. Supp. 3d 816, 827 (N.D. Ill. 2019) ("Because email would bypass the

methods of service the Hague Convention authorizes, the Convention preempts it as

inconsistent.").  In *Anova*, the court reasoned that Articles 11 and 19 of the Hague Convention suggest that the authorized means of service preempt any inconsistent methods because these provisions "leave countries free to consent, either unilaterally or together, to means of service that are not specifically authorized by the Convention," which "would hardly be necessary if the Convention generally permitted any means of service that are not explicitly authorized or prohibited by its text."  *Anova*, 2020 WL 419518, at *6.  The court further explained that "[i]f the Convention left parties free to serve each other by e-mail, it is hard to see why they would ever choose slower, more costly methods.  The parties to the Convention could hardly have intended that result; it is unlikely that they desired that the enumerated methods of service they agreed to could be superseded as soon as any new means of service became available."  *Id.*  Therefore, e-mail service is not permitted under the Hague Convention unless China has consented to such service, which it has not.

The cases cited by Corning in its motion for alternative service do not compel a different result.  *See* D.I. 7 at 9-10.  Those courts evaluated the e-mail service issue through the lens of Article 10(a) of the Convention, which states that "[p]rovided the State of destination does not object, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad."  Hague Convention, art. 10(a).  Courts have split on whether China's objection to this Article includes an objection to e-mail service based on differing interpretations of the term "postal channels."  *See Anova*, 2020 WL 419518, at *4-5 (collecting cases).  But "[e]ven if China's objection to Article 10(a) does not by itself preclude e-mail service, it is a separate question whether the Hague Convention nonetheless prohibits a means of service that is not explicitly addressed by its terms."  *Id.* at *5 (citing *Luxottica*, 391 F. Supp. 3d at 825).  The cases cited by Corning do not reach this separate

██████████████████████

question, which must be answered in the affirmative—the Hague Convention prohibits e-mail service because it is inconsistent with its authorized methods of service.

For these reasons, Corning's service of the Complaint via e-mail violates Rule 4(f)(3), which necessitates dismissal of the Complaint under Rule 12(b)(5) for insufficient service of process.

## V.    CONCLUSION

For the foregoing reasons, Jingbo respectfully requests that the Court dismiss with prejudice Counts I and II of the Complaint based on Corning's failure to state a claim and improper service of the Complaint.

Respectfully submitted,

OF COUNSEL:
Mark J. Abate
Calvin E. Wingfield
Keith A. Zullow
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
mabate@goodwinlaw.com
cwingfield@goodwinlaw.com
kzullow@goodwinlaw.com

Dated:  March 16, 2020

/s/ William G. Bauer
William G. Bauer
Erin E. Elmouji
WOODS OVIATT GILMAN LLP
1900 Bausch & Lomb Place
Rochester, New York 14604
(585) 987-2800
wbauer@woodsoviatt.com
eelmouji@woodsoviatt.com